

FILED

FEB - 6 2012

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY _____ DEPUTY

1   DANIEL G. BOGDEN
    United States Attorney
2   BRIAN PUGH
    SARAH E. GRISWOLD
3   Assistant United States Attorneys
    333 South Las Vegas Blvd., Suite 5000
4   Las Vegas, Nevada 89101
    (702) 388-6336
5

6

# UNITED STATES DISTRICT COURT
7
# DISTRICT OF NEVADA
8
## -oOo-
9

10  UNITED STATES OF AMERICA,                  )
                                               )       2:10-cr-0121-RLH-RJJ
11                  Plaintiff,                  )
                                               )
12          vs.                                )       GOVERNMENT'S TRIAL MEMORANDUM
                                               )
13  BRETT I. DEPUE,                            )
                                               )
14                  Defendant.                 )
                                               )
15  _____)

16          The United States of America, by and through Daniel G. Bogden, United States

17  Attorney, and Brian Pugh and Sarah Griswold, Assistant United States Attorneys, files its trial

18  memorandum as follows.

19                          **I. STATEMENT OF THE CASE**

20          From on or about February 1, 2005, to on or about May 31, 2007, defendant conducted a

21  conspiracy and scheme to defraud financial institutions by recruiting straw buyers to buy real

22  estate and using false and fraudulent representations to lenders to obtain mortgage loans to finance

23  the straw buyers' real estate purchases.  In doing so, defendant caused money proceeds from the

24  loan transactions to be disbursed to him or his companies.

25  .  .  .

26  .  .  .

## II. FACTS

Defendant is charged by criminal indictment with one count of conspiracy to commit mail, wire and bank fraud in violation of Title 18, United States Code, Section 1349, and eleven counts of wire fraud in violation of Title 18, United States Code, Section 1343.

From on or about February 1, 2005, to on or about May 31, 2007, defendant participated in a conspiracy with others charged and uncharged, including but not limited to the following individuals:

| Coconspirator | Role in the conspiracy | Charged or uncharged |
|---|---|---|
| Jared Arambel | Loan officer | serving 30 months in prison |
| Brian Barney | Second in command behind defendant and flipper | Charged/awaiting sentencing |
| Sam Cardoso | Created business entities, verified false employment, and straw | Charged/awaiting sentencing |
| Cassidy Cotten | Accountant and verified false employment | Charged/awaiting sentencing |
| Jenna Depue | Office manager, flipper, property finder | Charged/awaiting sentencing |
| Jared Estes | Property finder and office worker | Uncharged |
| Brett Gibbs | Recruiter and loan officer | Served one year in prison |
| Angelica Kimber | Processor of fraudulent documents | Charged/awaiting sentencing |
| Jeff Lonsdale | Recruiter, flipper, and property finder | Charged/awaiting sentencing |
| Paula Martin | Property finder and office manager | Uncharged |
| Anita Mathur | Partner to defendant | Charged/awaiting sentencing |
| Maria Ornelas | Office manager | Charged/awaiting sentencing |
| Maria Testa | Property finder and office worker | Uncharged |
| | | |

The conspiracy consisted of recruiting straw buyers to purchase real estate which defendant would control.  Defendant leased the properties and applied the leases toward mortgage payments.  The mortgage payments substantially exceeded the lease receipts.   Defendant

1  orchestrated these transactions for the purpose of receiving cash at the closing of the transactions.

2  Defendant obtained cash through the use of cash disbursements at the close of escrow to one of his

3  business entities or through the use of double escrows.

4  <u>Double escrows</u>

5      Defendant's scheme evolved over time.  Defendant orchestrated simple straw buyer

6  transactions wherein defendant used straw buyers to purchase properties using 100 percent

7  financing.  The properties would be purchased by the straw buyers at a price above the asking price

8  and the difference was disbursed at closing to one of defendant's entities.

9      It was more common for defendant to use double escrows.  In defendant's scheme, a

10  double escrow is  a transaction in which buyer buys a property and soon thereafter resells it to a

11  straw buyer at an inflated price.  Often, both sales would occur on the same day.  These

12  transactions are also referred to as a property flip.  Hereinafter, the buyer who buys and

13  immediately sells the property will be referred to as the "flipper."

14      Originally, defendant used hard money lenders to fund his double escrows.  Defendant

15  arranged for a hard money lender to provide the money for the flipper to "pay cash" to buy a

16  property at or below asking price.  At the same time, defendant arranged for a straw buyer to buy

17  the property from the flipper at an inflated price.  The straw buyer's purchase was financed.

18  Materially false information regarding the straw buyer's qualifications were used to obtain a

19  mortgage loan to finance the straw purchase.  The inflated price created seller proceeds to the

20  flipper which the flipper would give to defendant.  When the transaction closed, a disbursement

21  from escrow would pay off the hard money lender.

22      Later, defendant learned of a double escrow method that eliminated the need for a hard

23  money loan.  The property was still purchased at or below asking price and sold to a straw buyer at

24  an inflated price.  However, instead of using a hard money loan as the source of the flipper's cash

25  to purchase, the straw buyer's mortgage loan became the "cash" the flipper used to buy the property

26  from the seller.   In order for these double escrow to work, the first and second transactions had to

3

be conducted at the same time so the flipper had funds to pay for the property.  Again, materially false information regarding the straw buyer's qualifications were used to obtain a mortgage loan to finance the straw purchase.

Recruiting straw buyers

Defendant and his coconspirators targeted individuals with high credit scores who would qualify for one hundred percent (100%) or near 100% financing for the acquisition of real estate. The straw buyers were often friends and family of defendant or his coconspirators.  In most instances, to obtain 100% financing, straw buyers had to purchase the properties as owner-occupied residences.  None of the straw buyers intended to occupy the residences they purchased for defendant.

Defendant described the "investment opportunity" to the straw buyers as follows:

1.    Defendant would pay the investor for each house the investor purchased, usually $5,000.

2.    Investors did not have to provide any money for the transaction.  All the investors had to provide was their name and credit.  All mortgage payments, costs, fees and maintenance would be paid by Defendant.

3.    Participating in the transaction would improve the straw buyer's credit.

4.    The straw buyer would buy up to five properties.

5.    Defendant would put renters in the properties.

6.    The properties would be held for a period of time after which they could be sold for a profit.

Fraudulent loan applications

Defendant caused coconspirator Angelica Kimber and others to prepare loan applications and supporting documentation in the investors' names to submit to financial institutions to obtain mortgage loan financing to fund the real estate straw purchases.  The loan applications and supporting documentation contained materially false and fraudulent information to qualify the

investors for mortgage loans. The false and fraudulent information included, but was not limited to, the following:

1. <u>The true identity of the buyer/borrower</u> – Defendant was the true buyer of the properties. Defendant controlled the properties shortly after closing by having the properties rented and managed by his employees or by a property management company. For a period of time, before allowing the homes to go into default, defendant made the mortgage payments. The very purpose for which an individual applies for a loan is for the bank to determine that individual's credit worthiness. The fact that the borrower named on the loan application was not the person who was going to make the mortgage payments is material to a lender's decision whether to lend.

2. <u>Employer and position</u> – Defendant misrepresented the straw buyer's employer and position when their true information was insufficient to qualify them for a mortgage loan. Often, defendant used one of his shell companies, such as Weichey Orothodontic, as a false employer and listed the borrower's position as an executive position. In all but a few instances, the straw buyer did not work for the listed employer. This false information was frequently falsely verified by "CPA letters" or "accountant letters" included in the loan packages sent to lenders. Defendant had an accountant, Cassidy Cotten, who provided letters on his company letterhead that falsely stated that the borrower had been self-employed for a number of years. Lenders also expect borrowers to be employed for a certain number of years in their current position to show stability.

3. <u>Income</u> – In order to qualify for most mortgage loans, borrowers need to have sufficient income for the lenders to conclude that they would be able to afford their monthly mortgage payments. In these instances, defendant caused to be misrepresented the investors' income to qualify them for loans for which they

5

1           would not have qualified without the misrepresentation.

2      4.     <u>Assets</u> – Some lenders require borrowers to have bank accounts sufficiently large

3           for the borrowers to qualify for the loan.  In such instances, defendant artificially

4           inflated the borrowers' asset information.  Defendant used the following methods:

5           a.     Defendant deposited money into investors' bank accounts.

6           b.     Defendant added investors to his existing bank accounts.  This was

7                  ordinarily done when lenders required the borrower to have bank accounts

8                  with balances sufficiently large account over a period of time.

9           c.     Defendant caused documents to be forged that falsely verified

10               misrepresentations regarding the borrower's assets. The most commonly

11               used forgery was of a Wells Fargo Bank statement

12      5.     <u>Intent to occupy the property as a primary residence</u> – During the period of time

13           that defendant orchestrated his mortgage fraud scheme, a buyer of a primary

14           residence could obtain 100% financing of their home purchase if their credit score

15           was sufficiently high.  For this reason, defendant recruited straw buyers with

16           sufficiently high credit scores to qualify for 100% financing loans.  This limited

17           the amount of money defendant had to use to initiate the transactions.  Straw

18           buyers in every instance had no intent to occupy the properties purchased in their

19           names.  Regardless, defendant caused most of the straw buyers' loans to be

20           submitted as owner-occupied.  Defendant did this regardless of how many homes

21           were being purchased in the investors' names.  It was common for investors to

22           simultaneously purchase five homes all as owner-occupied.

23                       **III.  EVIDENTIARY AND DISCOVERY ISSUES**

24  A.     <u>Evidentiary Issues.</u>

25           The Government anticipates the following evidentiary issue:

26           The Government intends to offer statements made by coconspirators during and in

1  furtherance of the conspiracy. The Government is prepared to argue that such statements satisfy

2  the co-conspirator exception to the hearsay rule.

3  B.        Discovery Issues

4          The Government anticipates no discovery issues.  The Government has disclosed all

5  Jencks, Brady and Giglio material and observed its continuing discovery obligation by disclosing

6  all documents in its possession.

7                    **IV.  EXHIBIT LIST AND WITNESS LIST**

8          The exhibit list and witness list will be provided to defense counsel at calendar call.

9                    **V.  CERTIFICATE OF READINESS FOR TRIAL**

10          The undersigned hereby certifies that he is trial counsel for the United States herein; that

11  subpoenas have been issued for all non-Government employees who will testify herein; and that

12  the matter is ready for trial on the date set.

13          DATED this 1st day of February 2012.

14                              Respectfully submitted,

15                              DANIEL G. BOGDEN
                               United States Attorney
16

17

18                              BRIAN PUGH
                               SARAH E. GRISWOLD
19                              Assistant United States Attorneys

20

21

22

23

24

25

26

7

1        This is to certify that the foregoing Government's Trial Memorandum will be personally

2   served upon defense counsel prior to commencement of trial.

3            DATED this 1st day of February 2012.

4

5

6        BRIAN PUGH
         Assistant United States Attorney

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

8